EDMUND FREIDLI, Administrator, Appellee, v. DAVENPORT & MUSCATINE RAILWAY Co., Appellant.

**RAILROADS:** Accidents at Crossings—Negligence—Evidence. A
1 finding of negligence is justified from evidence that an interurban car was, during the nighttime, run at such a rate of speed over a publicly used and obscured crossing that the car was not under reasonable control, and that said crossing was one customarily used for the taking on and discharge of passengers.

**TRIAL:** Instructions—Objections—Waiver. Failure to object to
2 instructions when given, especially when counsel's attention was, by opposing counsel, specially drawn to the instruction in question, is a complete waiver of objection thereto. Section 3705-a, Code Supplement, 1913.

*Appeal from Muscatine District Court.*—M. F. DONEGAN, Judge.

THURSDAY, MARCH 15, 1917.

REHEARING DENIED FRIDAY, JUNE 22, 1917.

ACTION at law to recover damages for the death of plaintiff's intestate. There were verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*E. M. Warner,* for appellant.

*A. R. Whitmer,* and *Dutcher, Davis & Hambrecht,* for appellee.

1. RAILROADS: accidents at crossings: negligence: evidence.

WEAVER, J.—The defendant company operates an interurban electric railway between the cities of Davenport and Muscatine. Near the latter city, it crosses a public highway at a point known as Richman, or Richman

Crossing, where cars are accustomed to stop to receive and discharge passengers. The plaintiff's intestate, a farmer, driving to his home at night along said highway, and attempting to make the crossing, was struck and killed by one of the defendant's cars. To recover damages thus occasioned, this action is brought.

Roughly speaking, the car in question was moving from the west eastward, while deceased was driving from the south northward. In the angle between these two lines of approach, there was a bank or elevation of earth, on which there was more or less brush or small trees. The extent to which this intervening screen obscured the view of the track to travelers on the highway, and the view of the highway to motormen operating defendant's cars, form a question on which the witnesses do not altogether agree. The car was moving at about 35 miles per hour, and no stop at the crossing appears to have been contemplated. Deceased, according to the motorman, was driving at a slow or "jog" trot. His approach to the crossing was down an incline. The night was clear and bright. The only eyewitness of the collision was the motorman, and his statements are not altogether clear or free from confusion. This is due, no doubt, to the sudden and unlooked-for character of the accident and to the nervous shock resulting therefrom, rather than to any conscious purpose to distort the facts. The jury could properly find from his testimony that he discovered the horse driven by deceased at the first point or place where it could become visible to him in its approach to the crossing. This point he estimates at from 30 to 40 feet, and it is the theory of the defense in argument that the intervening obstruction was such that it was impossible for the motorman to discover the approach of a highway traveler from the south, or for such traveler to discover the approach of a car from the west, until within a few feet of the crossing. The motorman says he recognized the

crossing as a bad one, and for that reason omitted the sounding of the crossing whistle at the signal post standing ten trolley poles west of the crossing, but sounded it at the seventh pole. There is evidence, however, to justify the finding that the point where the horse and buggy first became visible to the motorman was considerably farther from the crossing than he places it, and the location of the car at that moment somewhere from 200 to 300 feet west of the point of collision.

As bearing upon the question of contributory negligence, the motorman says that, in the flash of his headlight upon the buggy, he saw deceased leaning back in the corner of the buggy top, which was dropped behind the seat, his hands and reins lying limp in his lap. There was also some evidence tending to show that deceased had been drinking while in town, and was carrying a bottle of whisky; but the record as a whole was such that the jury could properly find he was not intoxicated, and was reasonably capable of caring for himself. He was a resident of the neighborhood and familiar with the road and crossing. It should, perhaps, be added that, at the instant of collision, the horse had crossed the track, and escaped injury, but the buggy received the full force of the blow delivered by the car, and was carried or dragged along some distance toward the point where the car was finally stopped, a distance of about 150 feet.

At the close of the testimony on part of the plaintiff, and again at the close of all the testimony, defendant moved for a directed verdict in its favor, on the grounds: (1) That no negligence on part of the defendant is shown by the evidence; (2) that it is shown as a matter of law that the deceased was guilty of contributory negligence; and (3) that there is nothing in the evidence to justify the submission of the case to the jury under the rule or doctrine of "the last clear chance;" and that it appears affirmatively

that the motorman was guilty of no negligence resulting in injury to the deceased after said motorman saw, or in the exercise of reasonable care might have seen, the peril of the intestate. The court refused to direct a verdict, but held that deceased appeared to be negligent as a matter of law, and submitted the case to the jury upon the single proposition whether plaintiff was entitled to a recovery under the rule of the last clear chance. On this issue, the jury found for the plaintiff.

In its brief, appellant submits its case upon two propositions only: First, that there is no evidence tending to show negligence on part of the defendant; and, second, that the court committed error to the prejudice of the defense in Paragraphs 7 and 8 of its charge to the jury.

I. Negligence is charged in the petition in both general and specific terms. The specific allegation is that the car was being operated at a high and dangerous rate of speed, and that there was failure to give a signal or warning of the approach of the car to the crossing. We are quite clear that, even if we assume the peculiar character of this crossing and its surroundings to be just as appellant's counsel describe them, it presents a situation imposing upon the company the duty of reasonable care proportioned to the hazard so created, to avoid injury to persons lawfully using the highway. It is, of course, to be admitted that, generally speaking, no rate of speed by a railway car or train in the open country is negligent *per se*. But it is an equally well settled proposition of law that, where a railway is operated over a crossing or other place open to lawful public use, and especially where such place is obscured and rendered more than ordinarily hazardous by the nature of its surroundings, the company is bound to take notice of the hazard, and, by reasonable regulation of the operation or speed of its cars and use of its tracks, prevent, so far as is reasonably practicable, injury to those who are in the

rightful use of such public place or way. *Kinyon v. Chicago & N. W. R. Co.*, 118 Iowa 349; *Gray v. Chicago, R. I. & P. R. Co.*, 143 Iowa 268, 279 (160 Iowa 1); *Johnston v. Delano*, 175 Iowa 498; *Lundien v. Ft. Dodge, D. M. & S. R. Co.*, 166 Iowa 85.

This proposition is equally applicable to the case before us whether we consider the case as one of original duty resting upon the defendant by virtue of the peculiarly dangerous character of the crossing, or as one of resultant duty to avoid injuring the deceased after he had brought himself into the place of peril. So far as appears from the evidence, the motorman, though conscious of the dangerous character of the crossing, contented himself with a sounding of the whistle, and, without reducing speed or bringing his car under control, drove into the place of danger at a speed which he could not check in any effective way in time to avoid collision with any person seeking to make use of the public way at that point.

There was no error in the refusal of the trial court to hold as a matter of law that there was no evidence of negligence by the defendant.

2. TRIAL: instructions: objections: waiver.

II. In Paragraph 7 of its charge to the jury, the court used the following language:

"By 'last clear chance' is meant it is the duty of a person to use reasonable care to discover and know the peril in which another person has placed himself through his own negligence, and to do what he reasonably can to avoid injury to such other person, as soon as it is reasonably apparent, or, by the exercise of reasonable care, would be reasonably apparent, that such other person is in or is going into a place of danger. A person failing to perform such duty and use reasonable care under such circumstances would be guilty of negligence, and, if another person were injured thereby, such injured person could recover, not-

withstanding the fact that he himself were negligent in
going in or in going into such place of danger.  In such a
case, however, the acts or omissions constituting such neg-
ligence would be confined, as to the time of their occur-
rence, to the time after the person charged with negli-
gence saw or knew, or by the. exercise of reasonable care
would have seen or known, that the injured person was
in, or was going into, a place of danger.  In this case, there-
fore, the negligence, if any, must consist in some act or omis-
sion on the part of the motorman, McCauley, which happened
after he first saw, or by the exercise of ordinary care should
have seen, the horse driven by Mr. Campbell, and you should
not consider any of the evidence as to what happened prior
to that time as constituting negligence upon which the
plaintiff can recover in this case."

Appellant's argument is quite largely devoted to the
alleged erroneous statement of law in the language above
quoted.  Were that question, open to discussion in this case,
it would call for a general review of the precedents and
authorities from which has come the comparatively modern
doctrine of the last clear chance, or, as sometimes expressed,
the last fair chance, and might, perhaps, develop some
difference of judicial opinion as to the soundness and pro-
priety of the doctrine as stated by the court below.  But
upon the record before us, we think the appellant is not in
position to raise the question, and we therefore do not at-
tempt its decision.

It is shown by the abstracts that the trial court, hav·
ing prepared its charge, including the matter now com-
plained of, gave it to counsel for examination and for such
exceptions as they might wish to preserve.  After such op-
portunity for examination had been given, the trial judge,
with the official reporter and counsel on both sides, took up
the matter (not in the presence of the jury), and counsel
on either side were called upon to state their exceptions,

if any, to the charge. Appellant's counsel presented no specific objection or exception to the charge as prepared. Appellee's counsel, however, called special attention to Paragraph 7, the last clause or part of which is above quoted, saying:

"I call special attention to the last paragraph of Instruction 7, and ask counsel whether he has criticism as to that, and if so, I am willing to have it modified."

He also repeated the suggestion in another form, saying:

"I call special attention to Instruction 7 with reference to the language there used defining 'last clear chance,' and ask counsel if he has any exception to that instruction. If so, I will consent to have it modified."

The only response made by appellant to this proposition was, at first, "That is the one I had any question about;" but later he added, "As I said before, I stand on the charge as it is." After the case had been submitted and verdict returned, appellant, in a motion for new trial, sought to except to the paragraph in question, with others, the only reason assigned for the failure to except at the proper time being that counsel was then very weary from his labors in the case, and that he failed to discover the errors. If any effect whatever is to be given the statute which requires parties and counsel to take their exceptions, if any, to the court's charge when the same has been prepared and submitted to them for that purpose, this case would seem to be a clear one for its application. It is not denied that opportunity was thus given. Counsel frankly admits it in argument. Nor is it denied that this very proposition in Instruction 7 was particularly called to his attention and the attention of the court by plaintiff's counsel, who voluntarily consented to have it modified, if objection was made thereto. When, therefore, appellant's counsel announced his desire to "stand on the charge as it is," there is neither

hardship nor unfairness in holding him bound by his election. If there was any error in this instruction, counsel clearly invited it when, in moving for a directed verdict, he assigned as a ground thereof that the motorman was not shown to have been guilty of any negligence "after said motorman saw, *or in the exercise of reasonable care might have seen,* the peril of the intestate."

Treating the instructions, therefore, as the law of the case, we have only further to say that the verdict of the jury is justified by the evidence. It follows that the judgment appealed from must be, and it is,—*Affirmed.*

GAYNOR, C. J., LADD and PRESTON, JJ., concur.

EVANS, J. I concur. I would omit from the opinion the quoted instruction, inasmuch as we refuse to review it.