Ray **TILLERY**, a sole trader, dba Tillery Drilling Company, Plaintiff in Error,

v.

Kenneth **ELLISON**, individually and as a sole trader dba the Kenneth Ellison Oil Company and as a general partner of the Kenneth Ellison, Kenneth A. Ellison, Kenneth Alfred Ellison and K. Alfred Ellison Limited Partnerships; and Sullivan Torpedo Company, a Corporation; and Sullivan-Anderson Well Servicing, Inc., Defendants in Error.

No. 38296.

Supreme Court of Oklahoma.

Oct. 20, 1959.

Spurr & Steed, Shawnee, and Wm. Walter Hentz, Oklahoma City, for plaintiff in error.

Looney, Watts, Looney & Nichols, Anna B. Otter, Oklahoma City, for defendants in error.

BLACKBIRD, Justice.

This action arose out of an explosion October 15, 1955, of one or more nitro-

glycerin shells near a well that had been drilled for the purpose of discovering and/or producing oil on a lease owned by one of the defendants in error, Kenneth Ellison, d/b/a Kenneth Ellison Oil Company, and/or Kenneth Ellison Drilling Company. The explosion extensively damaged a GMC pickup truck and a cable tool rig, with drilling unit, owned and installed at the well by plaintiff in error, Ray Tillery, d/b/a Tillery Drilling Company, in the course of carrying out his contract with the lease owner, Ellison, to "work over" the well in an effort to make it produce, or increase its production. The shells involved were being used by Sullivan Torpedo Company and Sullivan-Anderson Well Servicing Inc., in performing a contract with Ellison to lower into the well to a depth of 6200 feet, and shoot, 1000 quarts of solidified nitroglycerin.

When Tillery, hereafter referred to as plaintiff, instituted the present tort action to recover damages to his truck and drilling rig, he named Ellison a defendant as well as the torpedo and well-servicing companies.

In his petition, plaintiff alleged, among other things, that because of the large amount of nitroglycerin involved, it was necessary for Russell Sullivan, officer and agent for both the torpedo and well-servicing companies, to press into service, as a part of the well-shooting crew, two of the latter company's employees, Brill and Chandler. In paragraph 5 of the petition, the explosion was alleged to have occurred in the following manner:

"In preparing to shoot this well, the shooting crew had loaded a large number of shells with solidified nitroglycerin sticks, some of which were scattered about the rig floor and some of which were scattered on the ground nearby. The shooting crew was using torpedo shells of a thin tin material, cylindrical in shape, being approximately eight (8) feet long and four (4) inches in diameter. They were of an old-make type and had not been perforated with holes in the end for the purpose of stringing them, nor with a bail which was necessary before they could be strung together in order to be lowered into the well. The crew was loading the shells with twenty (20) quarts per shell of solidified nitroglycerin. At about 5:30 P.M. on said date, the shooting crew had lowered into the well sixty (60) quarts of nitroglycerin, at which time, due to the pressure and the inability of the fluid to circulate freely through the nitroglycerin, the shells containing said nitroglycerin collapsed and stuck in the casing. After this condition was encountered, Mr. Sullivan directed his crew to perforate or punch holes in the shells which were loaded with nitroglycerin and lying out on the ground so that said shells would permit the fluid to circulate through the shells and the nitroglycerin; and, as a result thereof, said shells would go to the bottom of the hole. The shooting crew, following Sullivan's instructions, took a steel, pointed awl, or a sharp, point instrument similar to an ice-pick about four or five inches long and began punching holes into the tin shells loaded with the nitroglycerin. It was a hot day and, as the holes were being punched in the shells and the nitroglycerin, the jelly-like substance would adhere to the punch and, upon pulling the punch back out through the hole, a scraping or friction resulted. While one of the members of the crew was in the process of punching the holes into a shell loaded with nitroglycerin and while he was pulling the awl or ice-pick from one of the holes, one of the shells exploded causing one or more horrifying explosions which set off and exploded the remaining nitroglycerin and shells lying out on the ground."

Defendants' negligence in causing the explosion was alleged as follows:

"Plaintiff alleges that said explosion in its entirety and all resulting damages

and injury sustained to Plaintiff's property were caused solely by the negligence and want of care of the defendants, and each of them, in this the following, to-wit:

"a. That the well shooting crew negligently, carelessly and with gross disregard of the danger involved, *punched holes in the shells already loaded with nitroglycerin, which they knew or should have known would create a friction and cause said nitroglycerin to explode and, as a result of the friction* created by the passage of the metal ice-pick or awl through the metal shells, *an explosion resulted* causing damage to the Plaintiff's property. That in punching said holes in said shells, said Defendants were not using the degree of care necessary and commensurate with the dangerous qualities of the product with which they were working. That the Defendants Ellison had contracted with the Defendants Sullivan Torpedo Company and Sullivan-Anderson Well Servicing, Inc. to perform and do this well shooting. They had prescribed the method and manner, the amounts of nitroglycerin, the depth at which it would be shot and had their agent, servant and employee Kenneth Jackson there at the well-site to supervise said work; and, considering the nature of the work to be done and its highly dangerous propensities, it was the duty of the Defendants Ellison to properly supervise said shooting operations and to prevent any unsafe methods from being used in the handling of this highly explosive nitroglycerin. This was a duty that could not be delegated to the torpedo Company or to the Sullivan-Anderson Well Servicing, Inc. That, by reason of said Defendants' failure to perform that duty owed to the Plaintiff, said defendants are liable for the damages sustained.

"b. It was negligence for the Defendants Sullivan Torpedo Company and Sullivan-Anderson Well Servicing, Inc. to furnish employees to shoot this well who were inexperienced and had never handled nitroglycerin before, and *it was their negligence in punching holes through the metal shells and nitroglycerin causing friction which resulted in the explosion* and the damage sustained. *It was negligent* of the Defendants Ellison to permit the Torpedo Company and Sullivan-Anderson Well Servicing, Inc. *to commit said acts of negligence and carelessness which caused this damage;* and Kenneth Jackson, in charge of the operation of said well, for and on behalf of the Defendants Ellison, knew or should have known of such negligent acts and conduct and should have ordered the same stopped and other procedures used which would have been safer and commensurate with the degree of care necessary in dealing with high explosives.

"c. That the Defendants, through their agents, servants and employees, in preparing the explosive to shoot this well, failed to use the proper degree of care and skill required in the handling of said explosive, and the premature and unexpected explosion as aforesaid, was due solely to such negligence and carelessness of said Defendants, all of which would not have occurred if said explosives had been prepared and handled in a proper and prudent manner." (Emphasis ours)

Sullivan Torpedo Company's answer to plaintiff's petition was a general denial, together with a specific admission that it was employed as an independent contractor to shoot the well involved, a special denial that it, or its employees, were guilty of any of the acts of negligence alleged in the petition, and, a special plea that the explosion and resulting damage were brought about by unavoidable casualty. The answer of the defendant Sullivan-Anderson Well Servicing Company also contained a general denial, together with a plea of unavoidable casualty; and, in addition, a denial that it had

any contract or agreement for the shooting of the well and that any of its employees were at the well-site at the time of the explosion.

The defendant, Kenneth Ellison, filed a joint answer as an individual, a partnership, and as Kenneth Ellison Oil Company. Besides a general denial, said answer included special pleas of assumption of risk and unavoidable casualty. It also alleged that the defendant Sullivan Torpedo Company and Sullivan-Anderson Well Servicing Company were independent contractors.

Before the cause proceeded to trial before a jury, the defendant Ellison filed a "Motion To Elect", in which it alleged that plaintiff was attempting to invoke the doctrine of res ipsa loquitur on one hand and allege specific acts of negligence on the other. The motion further stated that "plaintiff must elect before trial which theory he will pursue." When, after the jury was impaneled, this motion was presented, the other two defendants joined in it, but it was overruled without prejudice to re-presentation at later stages in the trial.

Plaintiff's first witness was Walter J. McCaw. He had been plaintiff's driller on the well. He testified that, when he went to work at the well, he was made acquainted with Kenneth Jackson, whom he called Ellison's "farm boss" and who, he was told, was the man "to satisfy" and take orders from; and that Jackson did, in fact, give orders. When asked if Jackson gave "all of the orders", the witness testified: "Yes, sir. He told us about drilling the plug." After describing, in rather minute detail, the difficulty that was encountered in lowering 60 quarts of the nitroglycerin to the desired depth in the well (6200 feet) because of what he termed "floating rubber" left in it from two "Baker plugs" that had been drilled through, McCaw testified that, in his presence, Jackson directed that the rest of the 1000 quarts of nitroglycerin be loaded into shells; and that was the first time in his thirty-five years' experience in assisting with the shooting of some three or four hundred wells that the witness had

ever seen that large a shot loaded into all of its shells before they were started into the well. McCaw further testified that, after the shells were loaded, Sullivan told Jackson that holes would have to be punched in them to get them down in the well, and he handed one of his "helpers" an awl "and told him to go to making holes in those loaded shells on the derrick floor." McCaw further testified that he then left "because it was a little bit too dangerous for me", and added: "I didn't think it was safe there." When asked if he actually saw any of this hole-punching operation on the shells, McCaw testified: "I sure did. That is the reason * * *—why I left." The witness then described the operation on the first shells as he saw it, and answered in the negative a query by his attorney as to whether he had ever before seen a "shooter or his helpers punching * * * holes in a shell * * * loaded with solidified nitro-glycerin." The witness further testified that the awl being used to punch the holes was metal and that, when the explosion occurred, he had walked seventeen steps away toward the doghouse.

When first asked, on direct examination, if he saw the explosion, McCaw stated: "I certainly did." When asked to tell just what he saw, he answered: "Well, I just turned my head towards the well when it went off." When asked what Sullivan and his men were then doing, he testified: "They were right over the glycerin. * * * punching holes in those cans." When asked, on cross examination, why he had not gotten farther away from the well than seventeen steps, or feet, when the explosion occurred, he revealed that his stopping there was the result of a tool pusher's calling his attention to a broken draft on a forge. The witness also revealed that he had never seen solidified nytroglycerin explode before, nor had he seen the liquified type explode outside of a well. He represented that he had been on a certain lease in 1926, when friction exploded liquified nytroglycerin about twenty feet down in a well. He further testified that he had never seen anyone punch a hole in a loaded shell before, and

that the holes were supposed to be punched before they are loaded. The cross-examining attorney elicited from McCaw that though, from where he was, he could see Sullivan stooping down near the derrick floor, he could not discern what he was doing with the shells, but he "had an idea" Sullivan was putting wires through them for bails. On re-direct examination, the witness was allowed to testify that he did not "consider" punching holes with metal awls into metal shells loaded with solidified nitroglycerin, "a careful operation"; and opposing counsel was unable to draw from the witness any testimony to show a possibility of the explosion's having been caused by something else. McCaw's testimony as to what was happening on and around the derrick floor "just a few seconds" before the explosion was corroborated by one Calvin Huffaker, who had come to the lease a short time before the explosion. Huffaker testified, among other things, that he "did not see" the explosion and that the plaintiff, Mr. Tillery, was not there then.

Plaintiff also called as a witness Mr. Cullen C. Capps, owner of Capps Glycerin Company, of Seminole, Oklahoma. He gave extensive testimony concerning his years of experience with the use of nitroglycerin in shooting wells, and, when asked for his opinions, testified (among other things) that punching, with metal awls, metal shells loaded with solidified nitroglycerin, is not safe; that there was no good reason for doing that if the shells had been properly loaded; and that, in his opinion, that was probably what caused the explosion. When asked, on cross examination, if there are ever any other reasons for nitroglycerin's going off, this witness testified that, besides friction, a detonator and tremendous heat, are other causes, and that all of the things that might explode nitroglycerin are not known. He further testified that, if it becomes necessary to put bails on shells, this should be done before they are loaded and "some paper or something" placed in the shell to keep the friction away from the wire running through it. He further testified that, if the awl used is made of copper, "It ain't supposed to" create friction.

At the close of the testimony of his first witness, Lloyd Hoagland, his production superintendent, the defendant Ellison orally moved the court to require plaintiff to elect whether "he will proceed" on the theory of res ipsa loquitur or upon his specific allegations of negligence. After the sustaining of said motion, and of a demurrer to the evidence by the defendant, Sullivan-Anderson Well Servicing, Inc., *without exception* as far as the record shows, plaintiff's counsel announced that he elected "to stand" on his allegations of negligence. Despite this election, when the evidence was all in, before submission of the case to the jury, plaintiff submitted to the court two requested instructions, the second ("#II") of which concerned the doctrine of res ipsa loquitur, and read as follows:

> "You are instructed that since the nitroglycerin was under the complete management and control of the defendants Sullivan Torpedo Company and Sullivan-Anderson Well Servicing Company, Inc., at the time of the explosion, and that in the ordinary course of events in the performance of the work to be done, such an explosion would not have occurred if the defendants Sullivan had used the proper care in handling said nitroglycerin, the law raises a presumption in favor of the plaintiff that the explosion occurred as a result of the negligence and want of care of the defendants Sullivan, which is imputed to the defendants Ellison."

The trial judge overruled plaintiff's demurrer to defendants' evidence and motion for a directed verdict, and refused to give the above requested instruction, not including, in those he gave, any other, or similar, instruction authorizing the jury to apply the res ipsa loquitur doctrine to the case. Instead, the instructions he gave (in accord with plaintiff's above-mentioned election to base defendants' liability on specific acts of negligence) placed the burden on

plaintiff to prove culpable negligence on the part of the defendants left in the case. After the jury's deliberations, its verdict was for those defendants, and judgment was entered accordingly. After plaintiff's motion for a new trial was overruled, he perfected the present appeal.

In plaintiff's first two propositions for reversal, he charges that the trial court erred in refusing to give either his Requested Instruction No. II, or (in the alternative) to instruct a verdict in his favor. He does not seriously urge the "alternative" part of his proposition, however; and, especially in his counsel's representation that individual members of the jury stated, after the trial, that the reason for the verdict, was that they (the jurors) were not convinced that the explosion was caused by the puncturing of the nitroglycerin shells, plaintiff recognizes that without the evidence being sufficient to discharge his burden of proving that, there was no need for defendants' evidence to measure up to any particular standard.

 In his argument that the trial judge erred in refusing to authorize the jury, as per his Requested Instruction No. II, to apply the doctrine of res ipsa loquitur to the case, plaintiff attempts to show that it was a proper case for application of the doctrine, and he relies on rules quoted from Independent Eastern Torpedo Co. v. Gage, 206 Okl. 108, 240 P.2d 1119, and other cases (some of which are annotated beginning at 33 A.L.R.2d 792) allowing application of the doctrine even in cases where plaintiff's pleading alleges particular acts or omissions of the defendant as the cause of the accident and plaintiff's resulting injury. He attempts to distinguish this case from cases holding that proof of a specific cause of the accident leaves no room for application of the doctrine, by pointing out that, according to the jury's verdict, *he did not prove* what caused the explosion in question. He says he never purported to *know* the cause of the explosion and "only advanced one theory as to what reasonably might have caused it." The latest expressions of this court on the problems plaintiff now seeks to present are found in Furr v. McGrath, Okl., 340 P.2d 243. However, we do not think any such problem is before us in this case. Defendants call our attention to the hereinbefore mentioned election by plaintiff to have the case tried on the theory that the explosion was caused by specific acts of negligence on the part of the defendant; and to the fact that the trial judge's refusal to submit the case to the jury on the doctrine of res ipsa loquitur was merely consistent with, and prompted by, that election. Defendants say plaintiff is estopped to urge application of said doctrine after making such election and thereby leading them, as well as the trial court, to believe he assumed the burden of proving how the explosion happened and that it was the result of defendants' negligence. Plaintiff's only answer to this is that his election was not a free or voluntary one, but was compelled by the court's order. Yet, as far as the record shows, he acquiesced in, or indeed approved of, it. Not only did his trial attorney readily, and without objection, express for him a choice of one of the two alternatives offered him by the court's order, but thereupon voluntarily, and on his own initiative, obtained leave to amend his pleadings to conform to the proof; and neither in his motion for a new trial, nor in this appeal, has plaintiff assigned the court's election order as error. It is the duty of a party who thinks the trial court has erred against him to call said court's attention to such error, so that said court may have an opportunity to correct it. See Kurz v. Stafford, 135 Okl. 121, 274 P. 674, 676. See also Ward v. Continental Ins. Corp., 165 Okl. 20, 24 P.2d 654; Starr v. Vaughn, 113 Okl. 247, 241 P. 152. Ordinarily a court commits no error in refusing to instruct on an issue, or theory, that has been taken out of the case. See Heckfuss v. American Packing Co., Mo. App., 224 S.W. 99; Finney v. Blalock, 208 Ga. 218, 65 S.E.2d 920; Goldblatt Bros. v. Parrish, 110 Ind.App. 368, 33 N.E.2d 835, 839, 38 N.E.2d 255; Hill v. Elmore, 16 Ala.App. 474, 79 So. 148; Sandy Valley & E. Ry. Co. v. Hughes, 175 Ky. 320, 194

S.W. 344; Mollman v. Union Electric Light & Power Co., 206 Mo.App. 253, 227 S.W. 264; Smith v. Welch, 10 Cir., 189 F.2d 832; 53 Am.Jur., "Trial", sec. 577; 88 C.J.S. Trial § 388, p. 1052, note 10. And, argument pertaining to such excluded matters cannot be made the basis of a successful appeal. See Morrison v. Krouch, 141 Okl. 288, 285 P. 10; Hutchins v. Richardson, 100 Okl. 80, 227 P. 432; Moore v. Jefferson Standard Life Ins. Co., 192 N.C. 580, 135 S.E. 456. As to a party's estoppel to be heard on appeal contrary to a proposition or position he assumed, or elected to stand on, at the trial generally, see Ross v. Thompson, 174 Okl. 183, 50 P.2d 385; J. L. Lemmon Co. v. Oppenheimer, 155 Okl. 209, 8 P.2d 679, 680; Smith v. Peters, 46 Cal.App. 47, 188 P. 811; Freidli v. Davenport and M. R. Co., 180 Iowa 387, 161 N.W. 678. In Heckfuss v. American Packing Co., (Mo.App.) supra, the court held:

> "The case is taken outside the rule of res ipsa loquitur, where plaintiff assumes the burden of proving the exact and specific acts of negligence causing the injury, and the court submits it on such specific acts, and instructs that plaintiff has the burden to prove all these facts by a preponderance of the evidence."

In Kurz v. Stafford, supra, this court held:

> "The right of appellant to recover was properly submitted to the jury on his own theory. The jury finding against him on the theory relied upon, he will not be permitted to change front in this court and claim the right to recover upon some other theory."

In view of plaintiff's election to assume the burden of proving the negligence on the part of defendants that he claimed caused the explosion, and of the consequences of such election under the foregoing principles, we hold that the trial court's refusal to use plaintiff's Requested Instruction No. II in submitting the case to the jury furnishes him no ground for reversal. Having reached this conclusion,

it is unnecessary to express an opinion as to plaintiff's Proposition II.

The judgment herein appealed from is hereby affirmed.

WILLIAMS, V. C. J., and HALLEY, JOHNSON, IRWIN and BERRY, JJ., concur.